**CALOP BUSINESS SYSTEMS, INC., Plaintiff,**

v.

**CITY OF LOS ANGELES, and Does 1–10, Defendants.**

Case No. CV 12–07542 MMM (RZx).

United States District Court, C.D. California.

Oct. 30, 2013.

Juan Hong, Law Offices of Juan Hong, Irvine, CA, for Plaintiff.

Jennifer T. Taggart, Jeffrey Z.B. Springer, Demetriou Del Guercio Springer and Francis, Oscar R. Winslow, Los Angeles City Attorney's Office, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS

MARGARET M. MORROW, District Judge.

Calop Business Systems, Inc. ("Calop") filed this action against the City of Los Angeles ("COLA") and certain fictitious defendants on September 4, 2012.[1] The complaint alleged a claim for violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution under 42 U.S.C. § 1983, and for violation of Article 1, Section 7 of the California Constitution; as well as claims for violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a); the Airline Deregulation Act ("the Deregulation Act"), 49 U.S.C. § 41713(b)(1); the Railway Labor Act ("the RLA"), 45 U.S.C. § 151 et seq.; and California Labor Code §§ 90.5(a), 223, and

---

1. Complaint, Docket No. 1 (Sept. 4, 2012).

2810.[2] On July 16, 2013, COLA filed a motion for summary judgment,[3] which Calop opposed.[4] On July 25, 2013, Calop filed a motion for sanctions under 28 U.S.C. § 1927,[5] which COLA opposed.[6]

## I. FACTUAL BACKGROUND

### A. The Living Wage Ordinance

Calop asserts that Los Angeles City Ordinance Number 171,547, the Living Wage Ordinance ("LWO"), which is codified in §§ 10.37 et seq. of the Los Angeles Administrative Code, and took effect on May 5, 1997, is invalid.[7] The LWO requires employers who do contract or subcontract work for the City to pay their employees a minimum living wage, the amount of which depends on whether the employer also provides health benefits. L.A.ADMIN.CODE, § 10.37.2(a). The legislative findings that supported enactment of the LWO state:

> "Experience indicates that procurement by contract of services has all too often resulted in the payment by service contractors to their employees of wages at or slightly above the minimum required by federal and state minimum wage laws. Such minimal compensation tends to inhibit the quantity and quality of services rendered by such employees to the City and to the public. Underpaying employees in this way fosters high turnover, absenteeism, and lackluster performance. Conversely, adequate compensation promotes amelioration of these undesirable conditions. Through this article the City intends to require service contractors to provide a minimum level of compensation that will improve the level of services rendered to and for the City.
> The inadequate compensation typically paid today also fails to provide service employees with resources sufficient to afford life in Los Angeles. It is unacceptable that contracting decisions involving the expenditure of City funds should foster conditions placing a burden on limited social services. The City, as a principal provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest." *Id.*, § 10.37.

Only certain employers are bound by the LWO. Among these are airport employers and subcontractors of airport employers who perform work on contracts subject to the LWO. *Id.*, §§ 10.37.1(b), (g), (j), (n).

2. *Id.*

3. Motion for Summary Judgment ("Motion"), Docket No. 20 (July 16, 2013).

4. Opposition to Defendant's Motion for Summary Judgment, Docket No. 34 (Sept. 30, 2013).

5. Calop's Motion for Sanctions Under § 1927 ("Sanctions Motion"), Docket No. 28 (July 25, 2013).

6. Opposition to Motion for Sanctions Under § 1927 ("Sanctions Opp."), Docket No. 35 (Sept. 30, 2013).

7. Several of COLA's uncontroverted facts quote provisions of the LWO. Calop objects to these statements. (See COLA's Statement of Uncontroverted Material Facts ("SUF"), Docket No. 20-1 (July 16, 2013), ¶¶ 1–13, 20; Calop's Statement of Genuine Disputes of Material Fact ("SGI"), Docket No. 34-2 (Sept. 30, 2013), ¶¶ 2–13, 20.) COLA's citations in support of these statements of "fact" are not to evidence in the record but to the sections of the Los Angeles Administrative Code being quoted. The provisions of the LWO are not facts that can be disputed. They are the law that is at issue in this case. The court therefore cites the relevant provisions of the LWO throughout this order rather than the parties' statements of undisputed facts and genuine issues.

The LWO requires that airport employers and subcontractors pay their employees "ten dollars and thirty cents ($10.30) per hour with health benefits or, if health benefits are not provided, then fourteen dollars and eighty cents ($14.80) per hour."[8] *Id.*, § 10.37.2(a). Airport employers who provide health benefits must pay at least $4.50 per hour to the health benefit plan. *Id.*, § 10.37.3(a). Airport employers can therefore choose one of two options under the LWO: they can pay their employees at least $14.80 per hour without providing health benefits or they can pay $10.30 per hour and contribute $4.50 per hour to a health benefit plan. Regardless of the option they choose, airport employers' out-of-pocket expense is $14.80 per hour. The LWO also requires that employers provide at least twelve compensated days off per year for sick leave, vacation, or personal necessity at the employee's request, and, if that time is exhausted, an additional ten days per year of uncompensated time for sick leave to deal with an illness of the employee or a member of the employee's immediate family. *Id.*, § 10.37.2(b). The LWO has a supersession clause providing that "[p]arties subject to [the ordinance] may by collective bargaining agreement provide that such agreement shall supersede the requirements of this article." *Id.*, § 10.37.12.

The Los Angeles Bureau of Contract Administration is responsible for investigating employee complaints of noncompliance with the LWO. *Id.*, §§ 10.37.1(h), 10.37.6. If the bureau "determine[s] that an employer has violated this article, [it must] issue a written notice to the employer that the violation is to be corrected within ten (10) days." *Id.*, § 10.37.6(d). If the employer does not demonstrate within that ten-day period that it has cured the violation, the bureau may request that the awarding contract authority declare a material breach of the service contract, request that the city council debar the employer from receiving future City contracts, or request that the City Attorney bring a civil action against the employer. *Id.*

## B. Facts Underlying the Parties' Dispute

Calop is a California corporation that offers security and passenger services subcontract work to several airlines operating at the Tom Bradley International Terminal ("TB Terminal") at Los Angeles International Airport ("LAX").[9] These include Asiana Airlines, Singapore Airlines, EVA Air, Air Tahiti Nui, China Eastern, China Southern, Japan Airlines, Phillippine Airlines, Quantas Airways, Thai Airways, and Cathay Pacific.[10] Calop subcontracts with the carriers to provide employees who guard warehouses, screen the cargo warehouse, guard aircraft, and serve as passenger service security agents, baggage handling agents, "TUB operation agents," and catering screener agents.[11] Calop is thus

---

**8.** The minimum wage set by the LWO when it was first enacted was $7.25 per hour. On September 15, 2009, the mayor signed Los Angeles City Ordinance Number 180,877, which raised the minimum wage to the current rate.

**9.** SUF, ¶¶ 15–16; SGI, ¶¶ 15–16. Calop objects to this fact but its objection only concerns whether its work includes providing wheelchair services. Calop does not object to the remainder of the fact and the court ac-

cordingly considers the remaining aspects undisputed.

**10.** Calop's Statement of Additional Undisputed Material Facts ("Add'l SUF"), Docket No. 34–2 (Sept. 30, 2013), ¶ 23; COLA's Response to Calop's Statement of Additional Undisputed Material Facts ("Add'l SGI"), Docket No. 38–2 (Oct. 7, 2013), ¶ 23.

**11.** Add'l SUF, ¶ 24; Add'l SGI, ¶ 24.

a subcontractor to an airport employer, and is bound by the LWO.

On February 1, 2010, Calop entered into an Agreement of Wage and Healthcare Package with the Service Employees International Union ("SEIU").[12] The agreement provided that new employees would be paid $9.00 per hour from July 1, 2010 to November 30, 2012.[13] On June 17, 2010, Calop received a letter from the Equal Enforcement Opportunity ("EEO") Enforcement Section of the Los Angeles Bureau of Contract Administration stating that it had "received a complaint regarding the payment of [a] living wage to [Calop's] employees." The Bureau asked that Calop submit various documents so that it could verify Calop's compliance with the LWO.[14] On August 24, 2010, the EEO Enforcement Section sent a second letter reporting its finding that Calop needed to make "corrective retroactive payments to several

employees for underpayment of the Living Wage rate" between January 19 and February 1, 2010—the date its collective bargaining agreement with the SEIU became effective.[15] The letter asked that Calop calculate the amount it owed employees and issue back wages to those employees within ten days of its receipt of the letter.[16] On October 21, 2010, the EEO Enforcement Section sent Calop a final letter, noting that it had previously "determined that Cal[o]p was not in compliance with the LWO from the period of January 19, 2010 to February 1, 2010 [because] Calop was paying wages of $11.55 per hour and not providing health benefits," but that Calop had recognized its non-compliance and paid back wages to its employees. As a consequence, the letter stated, the EEO Enforcement Section had "determined that Cal[o]p [was] in compliance [for] the period in question." [17]

---

**12.** Add'l SUF, ¶ 25; Add'l SGI, ¶ 25; Declaration of Young Chong in Opposition to Defendant's Motion for Summary Judgment ("Chong Decl."), Docket No. 34–5 (Sept. 30, 2013), Exh. 3 (Agreement on Wage and Healthcare Package ("SEIU Agreement")). COLA objects to this fact and Exhibit 3 to Chong's declaration on the grounds that the SEIU Agreement is not relevant. The fact that Calop entered into the SEIU Agreement, however, is relevant factual background because it explains why the City concluded that Calop was not in compliance with the LWO between January 19 and February 1, 2010, as the latter date is the date on which the SEIU Agreement took effect. The court therefore overrules COLA's objection to paragraph 25 and Exhibit 3.

**13.** Add'l SUF, ¶ 26; Add'l SGI, ¶ 26; Chong Decl., Exh. 3 (SEIU Agreement at 1). COLA objects to this fact because it relies on the SEIU Agreement, which it contends is irrelevant. For the reasons stated, however, the SEIU Agreement is relevant. The court therefore overrules COLA's objection.

**14.** Declaration of Juan Hong in Opposition to Defendant's Motion for Summary Judgment ("Hong Decl."), Docket No. 34–4 (Sept. 30,

2013), Exh. 2 (June 17, 2010 letter from Sophy Tzeng to Connie Chong).

**15.** Add'l SUF, ¶ 29; Add'l SGI, ¶ 29; Hong Decl., Exh. 3 (August 24, 2010 letter from Sophy Tzeng to Connie Chong). COLA objects to this fact and Exhibit 3 to Hong's declaration on the grounds that the letter is irrelevant. The letter shows that the City investigated Calop's purported violations of the LWO; this is relevant to show that Calop has standing to assert its claims. The court accordingly overrules COLA's objection.

**16.** *Id.* at 2.

**17.** Add'l SUF, ¶ 27; Add'l SGI, ¶ 27; Chong Decl., Exh. 6 (October 21, 2010 letter from Sophy Tzeng to Connie Chong). COLA objects to this fact and Exhibit 6 on the grounds that the letter is irrelevant. The letter, however, provides relevant factual background, and it tends to show that Calop paid back wages to its employees after the City found it was not in compliance with the LWO. This is relevant because it shows that the City enforced LWO by requiring Calop to pay back wages, such that Calop has standing to assert its claims. The court thus overrules COLA's objection.

## II. DISCUSSION

### A. The Parties' Request for Judicial Notice

COLA requests that the court take judicial notice of four documents that are relevant to its motion: (1) The LWO, Los Angeles City Ordinance Number 171,547, (2) the LWO, as codified in §§ 10.37 et seq. of the Los Angeles Administrative Code; (3) Los Angeles City Ordinance Number 180,877, which, as mentioned, raised the minimum wage mandated by the LWO to its current level; and (4) a February 26, 2010 letter from John L. Reamer Jr., Director, Bureau of Contract Administration, to Ms. Gina Marie Lindsey.[18] Calop asks that the court take judicial notice of five documents: (1) Frequently Asked Questions about the LWO; (2) a June 17, 2010 letter from Sophy Teng, EEO Enforcement Section, to Connie Chong; (3) an August 24, 2010 letter from Helmut Peindl, EEO Enforcement Section, to Connie Chong; (4) an October 21, 2010 letter from Sophy Tzeng, EEO Enforcement Section, to Connie Chong; and (5) Los Angeles Municipal Code § 104.110.[19] Both requests are unopposed.

In deciding a motion for summary judgment, the court may consider evidence that can be judicially noticed under Rule 201 of the Federal Rules of Evidence. Under Rule 201, courts can take judicial notice of facts that are not subject to reasonable dispute, either because they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." FED. R.EVID. 201; see *Zavala v. Wal Mart Stores Inc.,* 691

F.3d 527, 546 (3d Cir.2012) (taking judicial notice of the fact that commercial buildings have emergency exits as a "matter of common knowledge" in affirming a grant of summary judgment); *American Alternative Ins. Corp. v. Hudson Specialty Ins. Co.,* 938 F.Supp.2d 908, 911 n. 1 (C.D.Cal. 2013) (taking judicial notice of public filings in deciding a motion for summary judgment).

■ Under Rule 201, municipal ordinances are proper subjects of judicial notice because they are not subject to reasonable dispute. *Tollis, Inc. v. County of San Diego,* 505 F.3d 935, 938 n. 1 (9th Cir.2007) ("Municipal ordinances are proper subjects for judicial notice"); *Engine Mfrs. Ass'n v. South Coast Air Quality Management Dist.,* 498 F.3d 1031, 1039 n. 2 (9th Cir.2007) (taking judicial notice of a municipal ordinance and stating that "[m]unicipal ordinances are proper subjects for judicial notice"); *Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1025 n. 2 (9th Cir.2006) (taking judicial notice of Santa Monica Ordinances Nos. 2116 and 2117). The court accordingly takes judicial notice of the various versions of the LWO COLA submitted by COLA and of Los Angeles Municipal Code § 104.110, which Calop asks that the court notice.

■ The court may also take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet." *Hansen Beverage Co. v. Innovation Ventures, LLC,* No. 08–CV–1166–IEG, 2009 WL 6597891, *1 (S.D.Cal. Dec. 23, 2009) (citing *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir. 1999)). See also *Daniels–Hall v. National*

---

18. COLA's Request for Judicial Notice in Support of Motion for Summary Judgment ("COLA RJN"), Docket No. 24 (July 16, 2013).

19. Calop's Request for Judicial Notice in Opposition to Defendant's Motion for Summary Judgment ("Calop RJN"), Docket No. 34–3 (Sept. 30, 2013).

*Education Association,* 629 F.3d 992, 999 (9th Cir.2010) (taking judicial notice of information displayed on the website of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson,* No. C 06–4670, 2008 WL 4183981, *5 (N.D.Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice"). The court could therefore take judicial notice of Reamer's February 26, 2010 letter to Lindsey, submitted by COLA, and of the document titled LWO—Frequently Asked Questions, submitted by Calop. These documents are both available on the LWO website and neither party disputes their authenticity. The court thus takes judicial notice of the LWO—Frequently Asked Questions document. Because the court does not find the February 26, 2010 letter relevant to its analysis, however, it declines to take judicial notice of that document.[20]

▇ As respects the three letters from the EEO Enforcement Section to Connie Chong that Calop asks that the court judicially notice, the documents are attached as exhibits either to the declaration of Juan Hong or the declaration of Young Chong in opposition to COLA's motion.[21] The documents are more properly considered evidence authenticated by Hong and Chong than proper subjects for judicial notice. Consequently, the court declines to take judicial notice of the documents,

but will consider them as evidence submitted in opposition to the motion.

## B. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56. A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

20. On October 11, 2013, COLA filed a second request for judicial notice of a document titled "City of Los Angeles Current and Prior Living Wage Rates for Airport Employees." (COLA's Additional Request for Judicial Notice, Docket No. 40 (Oct. 11, 2013).) COLA filed this request in response to Calop's filing of an unredacted version of a Standard Security Agreement discussed *infra.* (Calop had previously filed a redacted version of the document.) (See *id.* at 2.) Although the court could take judicial notice of this document under Rule 201 because it is available on the

LWO website and neither party disputes its authenticity, it declines to do so because it does not find the document relevant to analysis of the motion.

21. Hong Decl., Exh. 2 (June 17, 2010 letter from Sophy Tzeng to Connie Chong); Exh. 3 (August 24, 2010 letter from Helmut Peindl to Connie Chong); Chong Decl., Exh. 6 (October 21, 2010 letter from Sophy Tzeng to Connie Chong).

242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e)(2). Evidence presented by the parties at the summary judgment stage must be admissible. FED. R. CIV. PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987).

### C. Whether the Court Should Grant Summary Judgment on Calop's First Claim under the Due Process Clause and Article 1, Section 7 of the California Constitution

#### 1. Legal Standards Regarding Unconstitutional Vagueness

 "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." [22] *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

"An ordinance may be void for vagueness because either it (1) fails to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited; (2) impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application; or (3) abut(s) upon sensitive areas of basic First Amendment freedoms, [ ] operat[ing] to inhibit the exercise of (those) freedoms." *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th

Cir.2011) (quoting *Grayned*, 408 U.S. at 108, 92 S.Ct. 2294 (internal citations omitted)).

Where criminal sanctions are involved and/or the law implicates First Amendment rights, . . . a "more demanding" standard of scrutiny applies. *Id.* (citing *Maldonado v. Morales*, 556 F.3d 1037, 1045 (9th Cir.2009) (where criminal sanctions are involved, "[t]he standards of certainty in statutes punishing for offenses is higher than in those depending primarily on civil sanction for enforcement")); *Information Providers' Coalition for the Def. of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir.1991) (stating that where statutes provide criminal penalties, "the requirement for clarity is enhanced").

In applying this heightened requirement, however, "due process does not require impossible standards of clarity." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (internal quotation marks omitted)). "We can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110, 92 S.Ct. 2294. Indeed, the Ninth Circuit has cautioned that the void for vagueness doctrine should be used sparingly. See *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346 (1984) (noting that " 'under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.' This consideration limits the strong medicine of striking down statutes as facially vague," quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

 A statute may be challenged as unconstitutionally vague on its face or as

---

22. The scope of California's due process clause is commensurate with the Due Process Clause in the federal constitution. *Garcia v. Four Points Sheraton LAX*, 188 Cal.App.4th 364, 386, 115 Cal.Rptr.3d 685 (2010). Cal-

op's challenge under the California due process clause therefore rises or falls with its challenge under the federal due process clause, and the court will discuss only the federal claim.

applied to a particular party. See *United States v. Kilbride*, 584 F.3d 1240, 1256–59 (9th Cir.2009). "Outside the First Amendment context, a plaintiff alleging facial vagueness must show that the enactment is impermissibly vague in all its applications." *Humanitarian Law Project v. U.S. Treasury Department*, 578 F.3d 1133, 1146 (9th Cir.2009) (internal citation omitted). See also *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (holding that a plaintiff mounting a facial challenge must establish that "no set of circumstances exists under which the [challenged] Act would be valid"). Because a plaintiff mounting a facial attack must show that a law is invalid in all of its applications, he must first show that the law is unconstitutionally vague as applied to him. *Castro v. Terhune*, 712 F.3d 1304, 1311 (9th Cir.2013). See also *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547,

41 L.Ed.2d 439 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness").

## 2. Whether the LWO is Unconstitutionally Vague

Calop contends that the LWO is unconstitutionally vague for two reasons; first, because the supersession clause allows a collective bargaining agreement to set wages lower than the minimum wage set by the LWO,[23] and second, because the LWO does not define "health benefits."[24] Calop does not clearly articulate whether its due process challenge is facial or as applied.[25] In its motion, however, COLA argues that the challenge is facial,[26] and Calop does not refute, or even address, this argument in opposition. The court accordingly deems Calop's challenge to the LWO a facial one.[27] Calop must therefore

---

**23.** Opposition at 5.

**24.** Opposition at 2. COLA contends that Calop raised this argument concerning the health benefits provision for the first time in its opposition.

**25.** The complaint alleges that "[t]he LWO does not give fair notice of the practices to be avoided. The LWO does not provide reasonably adequate standards to guide enforcement." (Complaint, ¶ 47.)

**26.** Motion at 8–9.

**27.** It is unlikely that Calop filed this lawsuit within the statute of limitations. Calop's allegation that the ordinance is void for vagueness under the federal Due Process Clause forms the basis for its § 1983 claim. "It is well-established that claims brought under § 1983 borrow the forum state's statute of limitations for personal injury claims, and in California, that limitations period is two years. '[T]he statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury[.]' [I]t stands to reason that any facial injury to any right should be apparent upon passage and enactment of a statute." *Action Apartment*

*Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026–27 (9th Cir.2007) (holding that plaintiff asserting a substantive due process claim "should have known of its injury on the date of the ordinance's enactment"). Accordingly, Calop should have asserted its federal due process claim within two years of the date of enactment of the ordinance. Even assuming Calop's claim is based on the 2009 amendments to the ordinance, moreover, as opposed to the original enactment of the ordinance in 1997, Calop failed to sue within two years.

The statute of limitations also appears to have expired on Calop's claim under the California Constitution. California courts have held that such claims are governed by a one-year limitations period where an action alleges infringement of personal rights (California Code of Civil Procedure § 340) or a two-year statute where it alleges damage to property rights (California Code of Civil Procedure § 339). See e.g., *Acuna v. Regents of the University of California*, 56 Cal.App.4th 639, 645–46, 65 Cal.Rptr.2d 388 (1997) ("The one-year limitation period specified in section 340, subdivision 3, embraces not only bodily injuries but all infringements of personal rights as opposed to property rights," quoting

show that the two sections of LWO it challenges are invalid in all of their applications, starting with their application to Calop. See *Castro,* 712 F.3d at 1311. In determining whether the LWO is unconstitutionally vague, the court uses a lower standard of scrutiny because the LWO does not impose criminal sanctions or implicate first amendment rights.[28] *Hunt,* 638 F.3d at 712.

As noted, Calop first argues that the terms of the LWO are unclear because it purports to set a minimum compensation level but also contains a supersession clause that allow employers to pay less than the minimum compensation established.[29] COLA contends Calop cannot prevail on this challenge because it cannot show that, as applied to it, the terms of LWO are unconstitutionally vague.[30] The EEO Enforcement Section required Calop to pay back wages to its employees for the period that preceded its entry into a collective bargaining agreement with the SEIU because, during that period, Calop did not pay its employees the minimum wage mandated by the LWO for employers that did not provide health benefits to their employees. The EEO Enforcement Section found that Calop paid its employees $11.55

---

*Edwards v. Fresno Community Hospital,* 38 Cal.App.3d 702, 705, 113 Cal.Rptr. 579 (1974) (internal quotation marks omitted)). Here, because Calop's claim is based on due process rights, it asserts the infringement of personal rights and the applicable statute of limitations is one year. Cf. *Rosenbaum v. City and County of San Francisco,* No. C96–3409 MMC, 2005 WL 1170480, *4 (N.D.Cal. Jan. 12, 2005) ("[A]s all of plaintiffs' claims under the California Constitution allege infringement of personal rather than property rights, to the extent any such claims are based on events occurring before September 1995, such claims [] are time-barred"); *Oca v. Skylawn Memorial Park,* No. C 921190 THE, 1993 WL 255438, *2–3 (N.D.Cal. June 25, 1993) ("There is no statute of limitations accompanying Article I, Section 8 of the California Constitution.... However, on analysis of plaintiff's constitutional claim, it appears to the Court that the most appropriate limitations period is the one year period established for personal injury actions. Cal.Civ.Proc. Code § 340(3).... As plaintiff's claim accrued at the latest in February 1990 and his complaint was not filed until April 1992, the claim is time-barred pursuant to § 340(3)"). Despite the fact it appears all the claims are time-barred, COLA waived any limitations defense by failing to assert it.

**28.** The LWO provides that employees who assert a violation of the ordinance can bring suit to recover back wages, medical benefits, and appropriate relief for retaliation stemming from a report of a violation of the LWO. In the case of willful violations, a court may award treble damages. L.A. ADMIN. CODE,

§ 10.37.6(a). Employees can also report violations to the EEO Enforcement Section; if the Section finds a violation, it must direct the employer to correct it within 10 days. If the violation remains uncured, the agency can request that the awarding contract authority declare a material breach of the service contract, that the City Council debar the employer from future City contracts, or that the city attorney bring a civil action against the employer seeking unpaid wages or health premiums as well as a fine of up to one hundred dollars payable to the City for each day the violation remains uncured. *Id.,* § 10.37.6(d). Each of these remedies are civil sanctions because they are either compensatory or designed to coerce compliance. See *In re Dyer,* 322 F.3d 1178, 1192 (9th Cir.2003) ("Civil penalties must either be compensatory or designed to coerce compliance. In contrast, a flat unconditional fine totaling even as little as $50 could be criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance, and the fine is not compensatory" (internal citations and quotations omitted)); *Holland v. Nelson,* 5 Cal.App.3d 308, 312, 85 Cal.Rptr. 117 (1970) (collecting cases and stating that "the provision [of a civil code section] allowing [] the court the option of granting judgment for treble damages, is not to be construed as converting the statutory right of action into one for penal damages").

**29.** Opposition at 6.

**30.** Motion at 10.

per hour and no health benefits from January 19 to February 1, 2010.

■ Courts examining whether the language of an ordinance is unconstitutionally vague on its face frequently begin their analysis by looking to the dictionary definition of the terms used in the ordinance that are allegedly vague. See, e.g., *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 500–01, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (looking to Webster's New International Dictionary of the English Language to determine the meaning of the term "design"); *Hunt*, 638 F.3d at 711 (looking to the dictionary definition of "ideology" after concluding an ordinance was ambiguous because "it fails to define or provide any examples of when merchandise carries a 'religious, political, philosophical or ideological' message, and these terms have such amorphous meanings that it makes it difficult, if not impossible, for an individual to determine whether his conduct is proscribed by the ordinance"). Where the terms are clear however, the court need not look to the dictionary, but can determine from the plain words of the ordinance that the language is not vague. *Hoffman Estates*, 455 U.S. at 500–01, 102 S.Ct. 1186 ("Whatever ambiguities the 'design[ ] ...' standard may engender, the alternative 'marketed for use' standard is transparently clear: it describes a retailer's intentional display and marketing of merchandise.

The guidelines refer to the display of paraphernalia and to the proximity of covered items to otherwise uncovered items"); *Cameron v. Johnson*, 390 U.S. 611, 616, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) ("the statute prohibits only 'picketing ... in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any ... county ... courthouses....' The terms 'obstruct' and 'unreasonably interfere' plainly require no 'guess[ing] at [their] meaning.' Appellants focus on the word 'unreasonably.' It is a widely used and well understood word and clearly so when juxtaposed with 'obstruct' and 'interfere.' We conclude that the statute clearly and precisely delineates its reach in words of common understanding. It is 'a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be ... proscribed' " (ellipses original)).

■ Here, the court need not look to a dictionary because the terms used in the LWO are clear and unambiguous. The ordinance provides that "Employers shall pay Employees ... ten dollars and thirty cents ($10.30) per hour with health benefits or, if health benefits are not provided, then fourteen dollars and eighty cents ($14.80) per hour for Airport Employees." L.A. ADMIN. CODE, § 10.37.2(a). The LWO sets forth detailed definitions of Employer,[31] Employee,[32] Airport Employer,[33] and

---

31. " 'Employer' means any person who is a City financial assistance recipient, contractor, subcontractor, public lessee, public sublessee, public licensee, or public sublicensee and who is required to have a business tax registration certificate by Los Angeles Municipal Code §§ 21.00–21.198 or successor ordinance or, if expressly exempted by the Code from such tax, would otherwise be subject to the tax but for such exemption; provided, however, that corporations organized under § 501(c)(3) of the United States Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(3),

whose chief executive officer earns a salary which, when calculated on an hourly basis, is less than eight (8) times the lowest wage paid by the corporation, shall be exempted as to all employees other than child care workers." L.A. ADMIN. CODE, § 10.37.1(j).

32. " 'Employee' means any person—who is not a managerial, supervisory, or confidential employee and who is not required to possess an occupational license—who is employed (1) as a service employee of a contractor or subcontractor on or under the authority of one or more service contracts and who expends any

Airport Employee.[34] The supersession clause states that "[p]arties subject to this article may by collective bargaining agreement provide that such agreement shall supersede the requirements of this article." *Id.*, § 10.37.12. The plain language of the ordinance is transparently clear with respect to employers like Calop, who are not parties to a collective bargaining agreement and who do not provide health benefits for their employees. Such employers must pay their employees $14.80 an hour. The language leaves even less to be interpreted than "picketing in such a manner as to obstruct or unreasonably interfere," the phrase the Supreme Court held was not unconstitutionally vague in *Cameron,* 390 U.S. at 616, 88 S.Ct. 1335.

Enforcing these unambiguous terms, the City sent Calop a notice of non-compliance requiring that it calculate and pay back wages owed for the period from January 19 to February 1, 2010; it did so because Calop did not have a collective bargaining agreement in force during that time and had paid its employees $11.55 per hour without providing health benefits. Calop has adduced no evidence, and has not even argued, that it did not understand the terms of the ordinance or the exemption for companies that had entered into a collective bargaining agreement. The terms of the LWO are clear and afford a person of ordinary intelligence a reasonable op-portunity to know what it prohibited. Calop has therefore failed to show that these aspects of the LWO are unconstitutionally vague as applied to it. Consequently, the court grants summary judgment in favor of COLA on this aspect of Calop's due process challenge.

To the extent Calop challenges the supersession clause as unconstitutionally vague, the court also grants summary judgment in COLA's favor because Calop lacks standing to assert such a claim. A party must have Article III standing to challenge an ordinance. *Hunt,* 638 F.3d at 709–10 ("To maintain their challenge to the ordinances at issue in this action, Plaintiffs 'must establish constitutional standing with regard to the provisions challenged,'" quoting *Santa Monica Food Not Bombs v. City of Santa Monica,* 450 F.3d 1022, 1033 (9th Cir.2006)). At a minimum, "Art[icle] III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v.*

of his or her time thereon, including but not limited to: hotel employees, restaurant, food service or banquet employees; janitorial employees; security guards; parking attendants; nonprofessional health care employees; gardeners; waste management employees; and clerical employees; (2) as a service employee—of a public lessee or licensee, of a sublessee or sublicensee, or of a service contractor or subcontractor of a public lessee or licensee, or sublessee or sublicensee—who works on the leased or licensed premises; (3) by a City financial assistance recipient who expends at least half of his or her time on the funded project; or (4) by a service contractor or subcontractor of a City financial assistance recipient and who expends at least half of his or her time on the premises of the City financial assistance recipient directly involved with the activities funded by the City." *Id.*, § 10.37.1(i).

33. "'Airport Employer' means an Employer, as the term is defined in this section, at the Airport." *Id.*, § 10.37.1(b).

34. "'Airport Employee' means an Employee, as the term is defined in this section, of an Airport Employer." *Id.*, § 10.37.1(c).

*Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

Calop cannot show that it suffered an injury as a result of COLA's enforcement of the LWO's supersession clause because COLA never attempted to enforce that clause against Calop. The court accordingly grants summary judgment in COLA's favor on this aspect of Calop's due process claim as well.

As mentioned, an ordinance can also be deemed void for vagueness if it impermissibly delegates basic policy matters. *Hunt,* 638 F.3d at 712. Calop argues that "[t]he LWO supersession clause delegates the City of Los Angeles's police power to employers and unions." [35] It also asserts that the LWO is unconstitutionally vague because it allows a collective bargaining agreement to undercut and supersede the LWO, and the City could participate in that process by approving a wage lower than the minimum required by the LWO.[36] Calop does not explain how the City might "approve" a wage to which a union on behalf of its members and an employer otherwise subject to the LWO agree.

COLA contends that opt-out provisions of living wage and other minimum wage regulations do not invalidate laws under the due process clause.[37] In *RUI One Corp. v. City of Berkeley,* 371 F.3d 1137 (9th Cir.2004), the Ninth Circuit considered a facial challenge to a living wage ordinance that allowed employers who had entered into bona fide collective bargaining agreements to opt out of the ordinance. *Id.* at 1156. The court rejected plaintiff's argument that such a provision was an unconstitutional delegation of legislative

power to the unions because "a provision allowing employees bargaining collectively to opt out of the provisions of a labor regulation is not a delegation of legislative power at all." *Id.* at 1156–57 (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 109, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) ("An otherwise valid regulation is not rendered invalid simply because those whom the regulation is designed to safeguard may elect to forgo its protection")). The court found that the Berkeley City Council had validly exercised its legislative power by enacting an ordinance that only covered businesses in a certain geographic location, with a certain number of employees, and that did not have a collective bargaining agreement in place expressly waiving its applicability. *Id.* at 1157. The court noted that "[l]abor unions negotiating collective bargaining agreements with employers are not legislating, but rather negotiating on behalf of their members; if they reach an agreement with the employer for certain employee benefits and employment conditions that they consider superior to, but incompatible with, the Living Wage Ordinance, the parties can decide to waive its applicability." *Id.*

The Ninth Circuit's analysis in *RUI* is controlling, and compels the same conclusion here. As the Berkeley City Council did in *RUI,* the Los Angeles City Council exercised its legislative authority to make certain employers subject to the LWO—namely, those that perform work under a city contract or subcontract and that do not have a collective bargaining agreement expressly waiving the protections of the ordinance. In deciding the scope of the LWO, the Los Angeles City Council properly exercised its legislative

**35.** Complaint, ¶ 48.

**36.** Opposition at 5.

**37.** Motion at 10.

authority and did not impermissibly delegate that authority to unions, employers, or employees. Calop has therefore not shown that it merits summary judgment as a matter of law on this aspect of its due process challenge, and the court accordingly grants summary judgment in favor of COLA.[38]

Calop argues finally that the LWO is unconstitutionally vague because it does not define the term "health benefits." [39] Specifically, it questions whether this includes vision and dental plans, and whether it includes insurance policies with deductibles.[40] The LWO states that "[t]he health benefits required by this article shall consist of the payment of at least four dollars and fifty cents ($4.50) per hour by Airport Employers ... towards the provision of health care benefits for Employees and their dependents." L.A. ADMIN. CODE, § 10.37.3(a).

▮▮▮▮ As mentioned, a party must have Article III standing to raise a challenge to an ordinance. *Hunt*, 638 F.3d at 709–10. "Beyond these general standing requirements, constitutional claims also trigger special standing principles." *Id.* Included in these requirements is the fact that, "to raise a vagueness argument, Plaintiffs' conduct must not be 'clearly' prohibited by the ordinances at issue." *Id.* Calop lacks standing to assert that the term "health benefits" is unconstitutionally vague because paying its employees $11.55 without providing health benefits

from January 19 to February 1, 2010 was clearly prohibited by the LWO. Calop has not argued or adduced any evidence that it provided any type of health benefit to its employees during that period. Thus, whether "health benefits" includes vision and dental plans or insurance policies with deductibles did not affect the sanction imposed on Calop. Calop thus lacks standing to challenge the vagueness of this aspect of the LWO, and has not demonstrated that it can prevail on this aspect of its due process claim.

The court therefore grants summary judgment in favor of COLA on all aspects of Calop's due process claim.

## D. Whether the Court Should Grant Summary Judgment on Calop's Second Claim Alleging That the LWO is Preempted by ERISA

### 1. Legal Standard Governing ERISA Preemption

Calop next contends that the LWO is preempted by ERISA. "Congress enacted ERISA to 'protect ... the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting 29 U.S.C. § 1001(b)). Section 502(a) of ERISA, set forth at 29 U.S.C.

---

**38.** Calop cites several cases as support for its argument that the LWO is unconstitutionally vague. These cases are not relevant, however, because they are preemption cases. See *Livadas v. Bradshaw*, 512 U.S. 107, 118, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (holding that a state labor commissioner's policy of refusing to assist workers recover back pay if they were subject to a collective bargaining agreement that provided for mandatory arbitration was preempted by the NLRA); *Metro-*

*politan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (holding that a state law mandating minimum mental health care benefits was not preempted by the National Labor Relations Act ("NLRA")).

**39.** Opposition at 2.

**40.** *Id.*

§ 1132(a), provides "a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

Because "[t]he purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans[,] ... ERISA includes ... pre-emption provisions, which are intended to ensure that employee benefit plan regulation [will] be 'exclusively a federal concern.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) and citing 29 U.S.C. § 1144). Except for state laws regulating insurance, banking, or securities, ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). "State laws" include "all laws, decisions, rules, regulations, or other State action having the effect of law...." *Id.*, § 1144(c)(1).

■■■ Initially, the Supreme Court held that ERISA's preemption provision was "deliberately expansive," see *Pilot Life Ins. Co.*, 481 U.S. at 46, 107 S.Ct. 1549, that it extended beyond state laws "specifically designed to affect [employee welfare benefit] plans," and that it included laws whose effect was only "indirect," *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Thereafter, however, the Court " 'c[a]me to recognize that ERISA preemption must have limits when it enters areas traditionally left to state regulation.'" *Emard v. Hughes Aircraft Co.*, 153 F.3d 949, 953 (9th Cir.1998) (quoting *Operating Engineers Health and Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677

(9th Cir.1998) (citing *De Buono v. NYSA–ILA Medical & Clinical Servs. Fund*, 520 U.S. 806, 813–14, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997))); see also *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("[I]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere'"). The Court has thus directed that courts look "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671, as well as "to the nature of the effect of the state law on ERISA plans." *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997).

■■■ Applying the standard set forth by the Supreme Court, a court seeking to determine whether a state law claim falls within the scope of ERISA preemption must examine whether the law has a "reference to" or a "connection with" an ERISA plan. *Emard*, 153 F.3d at 954 (citing *Operating Engineers*, 135 F.3d at 677); see also *Providence Health Plan v. McDowell*, 385 F.3d 1168, 1172 (9th Cir. 2004) ("Generally speaking, a common law claim 'relates to' an employee benefit plan governed by ERISA 'if it has a connection with or reference to such a plan,'" quoting *Travelers Ins. Co.*, 514 U.S. 645, 655–56, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995)). State laws have "reference to" ERISA plans when they "act[ ] immediately and exclusively upon ERISA plans, ... or where the existence of ERISA plans is essential to the law's operation." *Dillingham*, 519 U.S. at 325, 117 S.Ct. 832; see

also *McDowell*, 385 F.3d at 1172 ("In evaluating whether a common law claim has 'reference to' a plan governed by ERISA, the focus is whether the claim is premised on the existence of an ERISA plan, and whether the existence of the plan is essential to the claim's survival. If so, a sufficient 'reference' exists to support preemption," citing *Dillingham*, 519 U.S. at 324–25, 117 S.Ct. 832); *Emard*, 153 F.3d at 954. State laws do not have reference to ERISA plans by simply "explicitly mention[ing] a covered employee welfare benefit plan." *WSB Electric, Inc. v. Curry*, 88 F.3d 788, 793 (9th Cir.1996). Rather, they must also "ha[ve] some effect on the referenced plans." *Id.*

State laws have "a connection with" ERISA plans if they [ (1) ] regulate the types of benefits provided by ERISA welfare benefit plans, [ (2) ] require the establishment of a separate employee benefit plan, [ (3) ] impose reporting, disclosure, funding or vesting requirements on ERISA plans, or [ (4) ] regulate ERISA relationships such as those between the plan and the employer, or the employer and employee. *Emard*, 153 F.3d at 958 (citing *Operating Engineers*, 135 F.3d at 678; *Aloha Airlines, Inc. v. Ahue*, 12 F.3d 1498, 1504 (9th Cir.1993)); see also *McDowell*, 385 F.3d at 1172 ("In determining whether a claim has a 'connection with' an employee benefit plan, courts in this circuit use a relationship test. Specifically, the emphasis is on the genuine impact that the action has on a relationship governed by ERISA, such as the relationship between the plan and a participant," citing *Abraham v. Norcal Waste Sys., Inc.*, 265 F.3d 811, 820–21 (9th Cir.2001), and *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Group, Inc.*, 187 F.3d 1045, 1052–53 (9th Cir.1999)).

■ If there is neither "reference to" nor a "connection with" ERISA employee welfare benefit plans, the state law claim is not preempted. *Employee Staffing Services, Inc. v. Aubry*, 20 F.3d 1038, 1041 (9th Cir.1994) ("Is the state telling employers how to write their ERISA plans, or conditioning some requirement on how they write their ERISA plans? Or is telling them that regardless of how they write their ERISA plans, they must do something else outside and independently of the ERISA plans? If the latter ..., there is no preemption. If the former, additional questions might need to be asked").

### 2. Whether the LWO is Preempted by ERISA

■ The LWO is not *per se* subject to ERISA because it is a minimum wage regulation. Wages are a traditional subject of the state's police powers. See *WSB Electric, Inc. v. Curry*, 88 F.3d 788, 791 (9th Cir.1996) ("It is well settled that wages are a subject of traditional state concern, and are not included in ERISA's definition of 'employee benefit plan,'" citing *Massachusetts v. Morash*, 490 U.S. 107, 118, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (holding that ERISA does not preempt a state law regulating vacation pay)). Nonetheless, ERISA could preempt the LWO if it refers to, or has a connection with, employee welfare benefit plans.

COLA argues that the LWO does not refer to ERISA plans because it does not require employers to provide particular benefits or plans, to alter existing plans, or even to provide plans or employee benefits.[41] It cites *WSB Electric*, in which the court held that the California prevailing wage law, although it referenced ERISA plans, did not have an effect on them, but

---

41. Motion at 13.

"simply [took] them into account when calculating the cash wage that [had to] be paid." 88 F.3d at 793. The wage law at issue in *WSB Electric* required that public works contractors pay employees a prevailing wage; they were able to do so by combining cash wages with contributions to benefit plans. *Id.* at 791. Because the law did "not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all," the court held that it did not refer to ERISA plans and was therefore not preempted by ERISA.[42] *Id.* at 793–94.

▮ Here, as in *WSB Electric,* the LWO expressly references ERISA plans in that it mentions health benefits. Like the law at issue in *WSB Electric,* however, the LWO does not have an effect on any ERISA plan. The LWO sets a minimum wage that certain employers must pay, and permits them either to pay it all in cash or through a combination of cash and benefits contributions. Like the wage law in *WSB Electric,* the LWO "regulates wages generally, not wages that are part of a particular employee benefit plan." *Id.* at 792.

As the Ninth Circuit held in that case, "[t]he references to ERISA plans in the [LWO] have no effect on any ERISA plans, but simply take them into account when calculating the cash wage that must be paid." *Id.* at 793. The LWO does not require that employers provide health benefits, dictate the level or type of health benefits an employer must provide, or state which health benefit plan an employer must choose. Where, as here, wage laws function irrespective of ERISA plans, they do not refer to ERISA plans and are not preempted by § 1144(a). *Dillingham,* 519 U.S. at 327, 117 S.Ct. 832 (stating that California's prevailing wage statute "functions irrespective of the existence of an ERISA plan" and that, "[a]ccordingly, [it] does not make reference to ERISA plans").

▮ COLA next contends that the LWO does not have a "connection with" ERISA plans because, under the four-factor test set forth in *Ahue,* 12 F.3d at 1504, the LWO does not regulate the type of benefits provided to employees, does not require the establishment of a separate

---

**42.** Calop contends that the *WSB Electric* court held that a law like the LWO that sets a fixed contribution for health benefit contributions refers to health benefits while a two-tier wage law does not. (Opposition at 11.) Calop misstates the holding of *WSB Electric.* The district court there originally found that the prevailing wage law was preempted by ERISA because it set a base hourly wage plus a required contribution for benefits, and mandated that employers pay the entire prevailing wage in cash or pay the base hourly wage and receive credit for the balance based on benefit contributions. The state enforced the law according to the "line-by-line method." 88 F.3d at 790. See also *WSB Elec., Inc. v. Curry,* Nos. C 90–0771 JPV, C 90–1109 JPV, 1990 WL 251009, *1 (N.D.Cal. Oct. 15, 1990) (noting that under the "line-by-line approach," the law set "a cap on the amount a contractor may apply towards reduction in cash wages" for each type of benefit provided,

and concluding that "the California laws in question are clearly preempted by ERISA, because they effectively place a cap on the amount of money an employer voluntarily provides to fringe benefit plans in lieu of cash compensation"). While the case was on appeal, the state amended the law to provide a "two-tier" approach under which employers had to pay a prevailing wage; the law permitted them to do this by combining cash payments with contributions to health plans, although it mandated that a minimum amount of cash be paid. *Id.* at 790–91. The Ninth Circuit did not decide that the "line-by-line" law was preempted by ERISA. Rather, it dismissed the appeal as moot, vacated the district court's decision, and remanded the case for reconsideration in light of the amendment. *J.R. Roberts Corp. v. Curry,* 972 F.2d 1340, 1992 WL 175954, *1 (9th Cir. July 23, 1992) (Unpub. Disp.).

employee benefit plan, does not impose reporting or other requirements on ERISA plans, and does not regulate the relationship between an ERISA plan and an employer.[43] See also *Emard*, 153 F.3d at 958. The court agrees. The LWO clearly does not regulate the type of benefits provided to employees; it does not require that employers provide certain types of benefits or offer any benefits at all. The LWO therefore does not have a connection with ERISA under the first prong of the *Ahue* test. *WSB Electric*, 88 F.3d at 794–95.

The second factor asks whether the law requires the establishment of a separate benefit plan. *Ahue*, 12 F.3d at 1504. Nothing in the LWO requires contractors to establish or maintain a benefits plan. The second *Ahue* factor is thus not implicated.[44] See also *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 12–13, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (holding that a state law requiring companies to make a one-time, lump-sum severance payment when closing plants was not preempted by ERISA because the law did not require the establishment or maintenance of an employee benefit plan). The third *Ahue* factor is whether the law imposes reporting requirements on ERISA plans. *Ahue*, 12 F.3d at 1504. Calop argues that because the EEO Enforcement Section requested, as part of its investigation of Calop's compliance with the LWO, that Calop provide its payroll registers, relevant portions of its employees' handbook, a copy of its health policy, and employee information and subcontractor information forms, the LWO imposes reporting requirements on employers and therefore has a connection with ERISA plans.[45] The LWO states that the EEO Enforcement Section shall "establish employer reporting requirements on employee compensation." L.A.

---

**43.** Motion at 15.

**44.** Calop argues that the LWO has a "connection with" ERISA plans because it is similar to a law the Fourth Circuit held was preempted in *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180 (4th Cir.2007). (Opposition at 12.) The court is not bound by Fourth Circuit law. Even considering Calop's argument, however, *Fielder* does not dictate a different conclusion. *Fielder* involved a law in which employers were required to expend a certain amount on health care or pay a fee to the state. *Id.* at 193. The Fourth Circuit held that because any rational business would pay benefits to their employees rather than give money to the state, the law did not provide meaningful alternatives for employers, but "effectively mandate[d] that [they] structure their employee healthcare plans to provide a certain level of benefits." *Id.* As a result, it held, "the Act has an obvious 'connection with' employee benefit plans and so [was] preempted by ERISA." *Id.* at 193–94. The LWO, by contrast, provides employers with meaningful alternatives. It does not require that employers pay money to the City if they have not contributed a certain amount

to a health benefits plan; it does not even require that employers provide health benefits for their employees. It simply mandates that total compensation equal a certain amount. Calop's citation to the Southern District of New York's opinion in *Retail Industry Leaders Association v. Suffolk County*, 497 F.Supp.2d 403 (2007) is also unpersuasive. Not only is this court not bound by the decisions of district courts in other circuits, but the law at issue in that case mandated that employers make "minimum 'employee health care expenditures' " and submit yearly reports detailing the expenditures over the prior year. *Id.* at 416. Such a law clearly has a connection to employee health benefit plans because it affirmatively requires employers to provide a plan, mandates the contributions that must be made to the plan, and requires that the employer submit a report concerning the details of the plan. The LWO, by contrast, does not require that employers provide health benefits for their employees, mandate that a certain amount be paid for that purpose, or require employers to make yearly reports detailing healthcare expenditures over the prior year.

**45.** Opposition at 14.

ADMIN. CODE, § 10.37.7. This requirement, however, does not "impose[ ] reporting, [or] disclosure ... requirements for ERISA plans." *Ahue*, 12 F.3d at 1504. Rather, it provides that employers shall report the amount of wages they are paying their employees. Whether the minimum wage is satisfied by a cash payment to employees or by the combination of a cash payment and a contribution to a health benefits plan, the ordinance simply requires that employers report the wages they have paid their employees, not information related to ERISA plans. None of the documents the EEO Enforcement Section requested from Calop, moreover, required the disclosure of or specifics concerning ERISA plans. As the *WSB Electric* court stated, the test under the third *Ahue* factor is not whether a wage law "imposes additional administrative burdens regarding benefits contributions on the *employer.*" 88 F.3d at 795 (emphasis original). The inquiry, rather, is whether the law "imposes additional administrative requirements for ERISA plans." *Id.* Here, as in *WSB Electric,* the LWO does not impose additional administrative requirements on ERISA plans. That an employer's disclosure of wages paid may include information regarding an ERISA plan does not mean the LWO requires that the ERISA plan to which the employer contributes report or disclose information not required by ERISA. Indeed, as noted previously, under the LWO, an employer need not contribute to an ERISA plan at all. For these reasons, the third *Ahue* factor does not demonstrate that the LWO has a connection with ERISA plans.

The fourth, and final, *Ahue* factor test is whether the law regulates ERISA relationships such as those between a plan and the employer, or the employer and employee. *Ahue*, 12 F.3d at 1504. COLA contends that the LWO does not regulate any ERISA relationship because it leaves the choice whether to provide a health benefits plan in the employer's discretion, and does not discourage employers from offering health benefits plans because they must pay the same wage whether they do so or not.[46] Again, the court agrees. Where the economic effect of a state law on employee benefit plans is "tenuous, remote or peripheral," the law does not have a connection with ERISA plans and is not preempted. *WSB Electric*, 88 F.3d at 796. Here, the LWO neither encourages nor discourages employers from providing health benefit plans for their employees. It therefore has no effect on such plans. Consequently, it has no connection with ERISA plans and is not preempted by ERISA.

### 3. Conclusion Regarding ERISA Preemption

Because the LWO neither refers to nor has a connection with ERISA plans, it is not preempted by § 1144(a). The court therefore grants summary judgment in COLA's favor on Calop's second cause of action alleging that the LWO is preempted by ERISA.

### E. Whether the Court Should Grant Summary Judgment on Calop's Third Claim Alleging That the LWO is Preempted by the Deregulation Act

#### 1. Legal Standard Governing Deregulation Act Preemption

COLA next contends that the court should grant summary judgment in its favor on Calop's third cause of action, which asserts that the LWO is preempted by the Deregulation Act. Congress enacted

---

**46.** Motion at 15–16.

the Deregulation Act in 1978 after "determining that maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety [and] quality ... of air transportation services [ ]." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (internal quotations and citations omitted); see also *Rowe v. N.H. Motor Trans. Assoc.*, 552 U.S. 364, 367–68, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008). To determine whether the Deregulation Act preempts a particular state law, the court must "start with the assumption that the historic police powers of the States [are] not to be superseded by the [Deregulation Act] unless that was the clear and manifest purpose of Congress." *Air Transport Association of America v. City and County of San Francisco*, 266 F.3d 1064, 1070 (9th Cir.2001). As noted, wage laws are within the state's historic police powers. The court therefore begins its analysis assuming that Congress did not intend that the Deregulation Act would preempt the LWO, a local minimum wage ordinance.

 "Congress's 'clear and manifest purpose' in acting the [Deregulation Act] was to achieve ... the economic deregulation of the airline industry." *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir.1998) (en banc). The statute includes an express preemption provision, which states that "a State ... may not enact or enforce a law, regulation or other provision having the force and effect of law related to a price, route, or service of an

air carrier." 49 U.S.C. § 41713(b)(1). The word "service" means "the prices, schedules, origins and destinations of the point-to-point transportation of passengers, cargo, or mail. In the context in which it was used in the Act, 'service' was not intended to include an airline's provision of in-flight beverages, personal assistance to passengers, the handling of luggage, and similar amenities." [47] *Charas*, 160 F.3d at 1261.

 The Supreme Court has held that the framework that governs analysis of ERISA preemption should be used to analyze Deregulation Act preemption as well. *Morales*, 504 U.S. at 384, 112 S.Ct. 2031. Thus, the "key phrase" in the Deregulation Act's preemption provision—related to—means having a connection with, or reference to, the prices, routes, or services of an air carrier. *Id.* "[S]tate enforcement actions [that have such a] connection with, or reference to, airline rates, routes, or services are [thus] pre-empted[.]" *Id.* at 384, 112 S.Ct. 2031 (internal quotations and citations omitted). A state law may "relate to" the subject matter of the Deregulation Act, and "run afoul of the [Deregulation Act's] preemption clause, even though such law has only an indirect effect on the rates, routes, or services of an air carrier." *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1188 (9th Cir.1998) (citing *Morales*, 504 U.S. at 385–86, 112 S.Ct. 2031); [48] see also *Rowe*, 552 U.S. at 370–71, 128 S.Ct. 989 (holding that a state

---

**47.** Given this express holding, which binds the court, Calop is simply wrong that service includes "the provision or anticipated provision of labor [by] the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink—matters incidental to and distinct from the actual transportation of passengers." (Opposition at 15.)

**48.** *Mendonca* concerned the Federal Aviation Administration Authorization Act ("FAAA") rather than the Deregulation Act. See *Mendonca*, 152 F.3d at 1185. The FAAA, however, contains a preemption provision that is "identical to an existing provision deregulating air carriers (the Airline Deregulation Act ("ADA"))." *Id.* at 1187.

law may be preempted even if its effect on rates, routes, or services "is only indirect"). Some state action, however, affects an air carrier's fares in "too tenuous, remote, or peripheral a manner" to trigger preemption. *Mendonca,* 152 F.3d at 1188 (citing *Morales,* 504 U.S. at 390, 112 S.Ct. 2031). Where a state law has an indirect effect on the rates, routes, or services of an air carrier, it will be preempted only where that interference is acute. *Id.* at 1189.

### 2. Whether the LWO is Preempted by the Deregulation Act

Calop's complaint alleges that the LWO increases the price of labor, and therefore has an impact on an air carrier's prices, routes, or services.[49] COLA counters that

Calop has adduced no evidence that the LWO increases labor costs or that it has had any impact on air carriers' routes and services.[50] It asserts that Calop has not shown the LWO has anything more than an indirect, remote, or tenuous relationship to an airline's prices, routes, or services.[51]

■ Calop disputes this, arguing it has proffered evidence that the LWO has increased the price of labor. Specifically, it cites a Standard Security Handling Agreement ("Security Agreement") between it and Nippon Cargo Airlines ("Nippon") related to services it performs for Nippon.[52] The agreement states that Calop is in compliance with the LWO and sets forth the agreed-upon price for Calop's provision of

---

**49.** Complaint, ¶ 65.

**50.** Motion at 17.

**51.** Motion at 18.

**52.** Opposition at 16; Add'l SUF, ¶ 28; Add'l SGI, ¶ 28; Second Declaration of Young Chong in Opposition to Defendant's Motion for Summary Judgment ("Second Chong Decl."), Docket No. 39 (Oct. 10, 2013), Exh. 1 (Standard Security Handling Agreement). Chong's first declaration redacted portions of the Standard Security Handling Agreement. (See Chong Decl.), Exh. 1 (Redacted Standard Security Handling Agreement.) On October 7, 2013, the court ordered Calop either to file an application to seal the Standard Security Handling Agreement or to file an unredacted version of the agreement. (Order Directing Plaintiff to File Unredacted Documents or an Application to Seal, Docket No. 36 (Oct. 7, 2013).) On October 10, 2013, Calop refiled Chong's declaration, which attached as Exhibit 1 an unredacted copy of the agreement. (See *id.,* Exh. 1 (Unredacted Standard Security Handling Agreement).) COLA objects to additional fact 28 and to Exhibit 1 to Chong's declaration on relevance and authentication grounds. The Agreement is relevant in that it tends to show that Calop increased its price for guard work subsequent to enactment of

the LWO and passed the increased labor cost on to the airlines with which it contracts. Moreover, Chong has properly authenticated the document. When proffered in connection with a summary judgment motion, documents authenticated through personal knowledge must be "attached to an affidavit that meets the requirements of [Rule 56(c)(4)]"; the declarant must be a person through whom the exhibits could be admitted into evidence. *Orr v. Bank of America,* 285 F.3d 764, 773–74 (9th Cir.2002). Young Chong is Calop's President. His declaration states that he "ha[s] personal knowledge of the facts set forth ... and [that,] if called as a witness, [he] could and would testify competently with respect to those matters." (Chong Decl., ¶¶ 1–2.) Chong reports that the Security Agreement attached to the declaration is "[a] true and correct copy" of a contract between an airline and Calop. (*Id.,* ¶ 7.) Chong's declaration satisfies the requirements of Rule 56(c)(4), and adequately authenticates the exhibit. See, e.g., *In re Kaypro,* 218 F.3d 1070, 1075 (9th Cir.2000) ("Griesbach's five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice"); *Barthelemy v. Air Lines Pilots Ass'n,* 897 F.2d 999, 1018 (9th Cir.1990) (concluding that a CEO's personal knowledge of various corporate activities could be presumed). The court accordingly overrules COLA's objection.

guard services: $13.75 per hour.[53] Calop signed the contract in 2002.[54] The LWO has been in effect since 1997. Calop has adduced no evidence showing that its rates prior to the effective date of the LWO were lower than those set forth in the Security Agreement. Nor has it submitted a declaration stating that it would pay employees less if the LWO were not in effect. Nonetheless, although neither party addresses the point, the court concludes there is evidence that the LWO has increased Calop's labor costs, since it is undisputed that Calop paid its employees $11.55 from January 19 to February 1, 2010, rather than the $14.80 mandated by the LWO. This is circumstantial evidence that Calop would pay its employees less than the wage required by the LWO were the ordinance not in effect, and that the LWO has increased Calop's labor costs as a result. Even drawing this inference, however, Calop has proffered no evidence that it has passed the increase on to the airlines or that its labor costs affect the prices, routes, or services of the air carriers with which it contracts. Calop has accordingly failed to raise triable issues of fact as to whether the LWO has any reference to or connection with the prices, routes, or services of an air carrier.

Any connection Calop may have shown, moreover, is "too tenuous, remote, or peripheral" to trigger preemption. Calop has not demonstrated that the LWO has had an acute impact on the contract price it charges any air carrier, or on the prices, routes, or services of that carrier. *Mendonca*, 152 F.3d at 1188–89 (holding, although plaintiffs alleged that their rates for services were based on labor costs, including prevailing wage requirements, that a wage law was only indirectly related to plaintiff trucking company's prices, routes, and services, that it did not "frustrate[ ] the purpose of deregulation by acutely interfering with the forces of competition," and that it was therefore not preempted by the Federal Aviation Administration Authorization Act ("FAAA")); [55] *Air Transport Association of America v. City and County of San Francisco*, 992 F.Supp. 1149, 1183 (N.D.Cal.1998) (holding that an ordinance that prohibited the city from contracting with companies whose provision of employee benefits discriminated between employees with spouses and employees with domestic partners was not preempted by the Deregulation Act because any effect on service was too tenuous, and stating that "[i]f any string of contingencies is sufficient to establish a connection with price,

53. Second Chong Decl., Exh. 1 (Standard Security Handling Agreement at 3).

54. *Id.* at 5.

55. Calop's argument that *Mendonca* is not controlling because it involves the dump truck transportation industry rather than the airline industry is unconvincing. It appears Calop asserts that *Mendonca* does not control because it involves the preemption provision of the FAAA rather than the Deregulation Act. Like the Deregulation Act, however, the FAAA was enacted to encourage across-the-board deregulation of the transportation industry. As noted, moreover, the preemption provision of the FAAA is identical to that of the Deregulation Act. *Mendonca*, 152 F.3d at

1187. *Mendonca* interpreted the FAAA's preemption provision by looking to cases that had interpreted the preemption provision of the Deregulation Act. *Id.* at 1188. The scope of the preemption under both statutes is thus commensurate. Furthermore, *Mendonca* analyzed whether a wage law improperly regulated the price, routes, or services of an industry. Calop contends the wage law in *Mendonca* was a "per diem" wage law, which is not analogous to the minimum wage mandated by the LWO. This distinction is immaterial. Both laws required employers to pay their employees more than a certain minimum wage. *Mendonca* is therefore relevant in assessing Calop's argument here.

route or service, there will be no end to ADA preemption.... Congress did not [ ] through the [Deregulation Act], exempt the airlines from generally applicable employment laws"), aff'd, 266 F.3d 1064 (9th Cir.2001); see also *Alim v. Aircraft Service Intern., Inc.*, No. C 12–02133 WHA, 2012 WL 3647403, *3 (N.D.Cal. Aug. 23, 2012) (stating, without deciding whether various California wage and hours laws were preempted by the Deregulation Act, that "because ASII is not itself an airline, but rather a provider of contract services to airlines, it is possible that the application of California meal-and-rest break regulations to ASII's employees would affect airline services 'in too tenuous, remote or peripheral a manner to have a preemptive effect' "). The court accordingly grants summary judgment in favor of COLA on Calop's third cause of action because it concludes that the LWO is not preempted by the Deregulation Act.

## F. Whether the Court Should Grant Summary Judgment on Calop's Fourth Claim Alleging That the LWO is Preempted by the RLA

### 1. Legal Standard Governing RLA Preemption

▮▮▮ Calop next asserts that the LWO is preempted by the RLA.[56] The Supreme Court has cautioned that "[p]reemption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.' " *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (citing *Fort Halifax*, 482 U.S. at 21, 107 S.Ct. 2211). The RLA regulates the nego-

tiation of collective bargaining agreements in the railway and airline industries.[57] Congress passed the RLA "to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." *Id.* It "imposes a duty on employers and employees 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions.' " *Air Transport Association*, 266 F.3d at 1064 (citing 45 U.S.C. § 152). Unlike the Deregulation Act, the RLA does not contain an express preemption provision. Courts have interpreted the statute as preempting state law in three situations, however.

"First, state laws prohibiting collective bargaining altogether by railway and airline employees are preempted because they directly conflict with the RLA's express allowance of collective bargaining. Second, state law causes of action that depend upon the interpretation of [collective bargaining agreements] are preempted because the interpretation or application of existing labor agreements are the exclusive jurisdiction of the arbitrational bodies created by the RLA.... Third, state laws that frustrate the purpose of the RLA are preempted." *Id.* at 1076.

The RLA does not preempt state or local efforts to set minimum substantive requirements for contract terms. *Id.* In assessing whether a state law sets minimum substantive requirements, the *Air Transport Association* court stated that courts should look to cases interpreting the scope of the National Labor Relations Act's ("NLRA") preemption of state law "be-

---

**56.** Opposition at 17.

**57.** COLA does not dispute Calop's assertion that, as a subcontractor whose employees perform functions traditionally performed by employees of air or rail carriers, and whose work is subject to the direct or indirect control of common carriers, Calop is subject to the RLA. (See Opposition at 17–20; Reply in Support of Motion for Summary Judgment ("Reply"), Docket No. 38 (Oct. 7, 2013) at 8–9.)

cause the two laws treat the issue of whether minimum labor standards are preempted the same." *Id.* at 1077 n. 5. The court cited *Dillingham Construction N.A., Inc. v. County of Sonoma,* 190 F.3d 1034, 1039–40 (9th Cir.1999), which held that the NLRA did not preempt a California law requiring public works employers to pay prevailing wages to apprentices. *Air Transport Association,* 266 F.3d at 1077.

### 2. Whether the LWO is Preempted by the RLA

 COLA contends that the court must grant summary judgment in its favor on Calop's claim that the LWO is preempted by the RLA because the LWO does not involve any of the three situations in which courts have found RLA preemption.[58] The court agrees. The LWO obviously does not prohibit collective bargaining and it is not a state law cause of action that depends upon interpretation of a collective bargaining agreement ("CBA"). The question thus is whether the LWO frustrates the purpose of the RLA. Calop contends only that the LWO is preempted by the RLA because it is a minimum wage statute.[59] In support of this argument, it cites a California appellate court decision, which states that "[a]ppellants' claims for[, *inter alia,*] state minimum wages … are preempted by the RLA." *Fitz-Gerald v. SkyWest Airlines, Inc.,* 155 Cal.App.4th 411, 422, 65 Cal.Rptr.3d 913 (2007). Calop, however, overlooks the analysis of the

*Fitz-Gerald* court, which held that the RLA preempts state law causes of action that depend on interpretation of a CBA; it concluded that the claim for violation of the minimum wage law at issue in that case required such an interpretation.[60] *Id.* at 420–21, 65 Cal.Rptr.3d 913.[61] Here, the LWO neither creates a cause of action nor requires interpretation of a CBA. Indeed, to the extent a CBA is in place, the provisions of the LWO are superseded.

The LWO, moreover, does not frustrate the purpose of the RLA because it does not discourage collective bargaining or dictate the outcome of such a process. If anything, it encourages collective bargaining concerning rates of pay, rules, and working conditions, because it provides that the terms of a CBA will supersede the requirements of the ordinance. In *Fortuna Enterprises, L.P. v. City of Los Angeles,* 673 F.Supp.2d 1000 (C.D.Cal.2008), the court held that a living wage ordinance for airport hotel workers did not frustrate the purpose of the NLRA because it "simply set[ ] the rate of the 'living wage' and then allow[ed] the hotels to enter into a collective bargaining agreement if they wish[ed to do so]. The[ordinance imposed] no restrictions on the terms of the collective bargaining agreement…. [Rather, it] allow[ed] a collective bargaining agreement to set wages at a rate higher or lower than the wage set by the Ordinance." *Id.* at 1005. Similarly, here, the LWO sets a

---

**58.** Motion at 19.

**59.** Opposition at 17.

**60.** Whether the LWO is preempted by the RLA, moreover, is a question of federal law. The court need not adopt the opinion of a California state court when determining such an issue.

**61.** The collective bargaining agreement at issue in *Fitz-Gerald* established different levels

of compensation for different blocks of time worked by flight attendants—flight pay, block time, overtime, flight standbys and layovers. The court noted that, "[a]ssuming, *arguendo,* that the trial court found meal and rest break violations, it would have to determine whether the FA was receiving flight play or block time play when the violation occurred." *Id.* at 421, 65 Cal.Rptr.3d 913. This required interpretation of the CBA. *Id.*

living wage that applies to employers performing work under city contracts and allows those employers to enter into collective bargaining agreements that set wages higher or lower than the living wage set forth in the LWO.[62] Such provisions do not interfere with or frustrate the purpose of the RLA. The court therefore finds that the LWO is not preempted by the RLA and, for that reason, grants summary judgment in favor of COLA on Calop's fifth cause of action.

### G. Whether the Court Should Grant Summary Judgment on Calop's Fifth Claim Alleging That the LWO Violates California Labor Code §§ 90.5(a), 223, and 2810.

 California Labor Code § 2810 provides:

"A person or entity shall not enter into a contract or agreement for labor or services with a construction, farm labor, garment, janitorial, security guard, or warehouse contractor, where the person or entity knows or should know that the contract or agreement does not include funds sufficient to allow the contractor to comply with all applicable local, state, and federal laws or regulations governing the labor or services to be provided."

CAL. LAB. CODE § 2810(a).

The statute creates a private right of action for "[a]n employee aggrieved by a violation of subdivision (a)." *Id.*, § 2810(g)(1). It expressly states, however, that "[a]n action under this section shall not be maintained unless it is pleaded and proved that an employee was injured as a result of a violation of a labor law or regulation in connection with the performance of the contract or agreement." *Id.* Under § 2810, the cause of action lies not against the contractor that employs the employees, but against the other party to the contract. *Castillo v. Toll Bros., Inc.*, 197 Cal.App.4th 1172, 1190 n. 11, 130 Cal. Rptr.3d 150 (2011) ("For clarity, we will

---

**62.** At the hearing, Calop argued that if the LWO set the minimum wage rate at $1 million, it would be preempted by the RLA because it would be so restrictive as to dictate the results of the collective bargaining process. In *Chamber of Commerce of the United States v. Bragdon*, 64 F.3d 497 (9th Cir.1995), the Ninth Circuit concluded that an ordinance that set requirements that were so restrictive that they virtually dictated the results of the collective bargaining process was preempted by the NLRA because it was incompatible with the goals of the NLRA. *Id.* at 501–02. The ordinance in *Bragdon* was a prevailing wage ordinance that required certain employers to pay their employees wages that were determined "by reference to established collective-bargaining agreements within the locality in which the public work [was] to be performed." *Id.* at 499. This manner of setting wages, the court held, gave employers what amounted to a Hobson's choice—they had either to accept the results of third parties' collective bargaining processes or enter into a collective bargaining agreement themselves. *Id.* at 502. It concluded that the ordinance interfered with the free economic forces that typically drive negotiations between employers and a collective bargaining unit, and thus that it was preempted by the NLRA. *Id.* at 504. Calop has adduced no evidence that the LWO is a prevailing wage law, and has not otherwise shown that the price set by the LWO dictates the results of the collective bargaining process. See *Fortuna*, 673 F.Supp.2d at 1009–10 ("[T]he rate in the Ordinance is not tied directly to the rates established in collective bargaining agreements between third parties. Thus, the employer will have the opportunity to negotiate a collective bargaining agreement whose rates could be higher or lower than the living wage. In light of this important distinction [between this case and *Bragdon*], the Court finds that the substantive requirements of the Ordinance are not so 'restrictive as to virtually dictate the results of the contract,'" citing *Bragdon*). Calop's hypothetical, moreover, does not address the actual facts of the case. Calop has presented no evidence that the minimum wage established by the LWO is so restrictive as to dictate the outcome of the collective bargaining process. Calop's hypothetical is therefore not useful in deciding this case.

use the term 'contracting party' to refer the 'person or entity' to be held derivatively liable under subdivision (a). We will use the term 'employer' to refer to the other party to the contract, referred to as the 'contractor' in subdivision (a), which employs the aggrieved workers"); see also *Rojas v. Brinderson Constructors Inc.*, 567 F.Supp.2d 1205, 1208–09 (C.D.Cal.2008) ("[I]n order to state a claim against the [contracting party] Refinery Defendants, Plaintiffs must not merely allege that [their employer] Brinderson violated applicable labor laws but also that the Refinery Defendants knew or should have known that their contracts with Brinderson did not include sufficient funds for Brinderson to comply with those laws").

■ COLA contends that Calop does not have standing to sue under § 2810 because it has not, and cannot, show that it is an aggrieved employee.[63] Aside from quoting the allegation in its complaint that "Calop brings the state claim on behalf of itself," Calop does not respond to this argument.[64] Calop has neither alleged nor adduced evidence that it is an employee of a contractor who was injured by the contractor's entry into an agreement with COLA that COLA knew provided insufficient funds to comply with local, state, or federal law. Indeed, Calop could not adduce such evidence. Calop is the contractor. It is not an employee. The statute clearly does not cover injury that Calop, as the contractor and employer, may suffer as a result of contracts into which it enters with third parties. Accordingly, Calop has not shown that it has standing to assert a claim under § 2810(a).

Calop does argue that it has citizen and/or taxpayer standing under California Code of Civil Procedure § 526a.[65] COLA counters that Calop did not include an allegation to this effect in its complaint, and cannot raise the argument now in order to avoid summary judgment.[66] Calop's complaint, however, states that it brings the claim "on behalf of itself, and the general public."[67] Although the complaint may not have clearly identified § 526a as the statute under which Calop sued on behalf of the general public, the opposition was nonetheless not the first time Calop asserted it could sue as a citizen/taxpayer. COLA contends that even if the court finds that Calop has properly alleged it was suing under § 526a, it cannot show it has taxpayer standing because it has not demonstrated that it was assessed a tax, and because, even if had it been, it fails to identify an injury in fact sufficient to give it under Article III standing in federal court.[68]

■ Section 526a provides:

"An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein." CAL.CODE CIV. PROC. § 526a.

**63.** Motion at 21.

**64.** See Opposition at 21 (citing Complaint, ¶ 78.)

**65.** Opposition at 21.

**66.** Reply at 11.

**67.** Complaint, ¶ 78.

**68.** Reply at 11.

"The primary purpose of this statute, originally enacted in 1909, is to 'enable a large body of the citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirements.'" *Blair v. Pitchess,* 5 Cal.3d 258, 267–68, 96 Cal.Rptr. 42, 486 P.2d 1242 (1971). "A cause of action under Code of Civil Procedure section 526a will not lie where the challenged governmental conduct is legal." *Coshow v. City of Escondido,* 132 Cal.App.4th 687, 714, 34 Cal.Rptr.3d 19 (2005). Thus, to bring a § 526a claim under § 2810, Calop would have to show that COLA was violating the law by entering into contracts with contractors that it knew would provide insufficient funds to permit the contractor to comply with all applicable local, state, and federal laws. Cf. *Blair,* 5 Cal.3d at 268, 96 Cal.Rptr. 42, 486 P.2d 1242 ("[I]t has been held that taxpayers may sue State officials to enjoin such officials from illegally expending state funds"). For reasons already discussed, Calop cannot make such allegations.

■■■■■■■ Additionally, a plaintiff alleging taxpayer standing under § 526a must plead that it has been assessed and paid a tax within the past year. CAL.CODE CIV. PROC. § 526a; *Blair,* 5 Cal.3d at 268–69, 96 Cal.Rptr. 42, 486 P.2d 1242 ("It is clear that the present action was properly brought under section 526a. Plaintiffs have alleged, and by their affidavits have established, that they are residents and taxpayers of the County of Los Angeles"); *id.* at 265 n. 2, 96 Cal.Rptr. 42, 486 P.2d 1242 ("The affidavits of plaintiffs in support of their motion for summary judgment establish that they each reside in the City of Compton, which is within the County of Los Angeles and that each of them, within one year prior to the commencement of this action, was assessed and paid a real property tax to the county"). Calop's complaint does not allege that it has paid a tax within the past year. Nor has Calop adduced evidence in opposition to COLA's motion for summary judgment that it has paid a tax within the past year. Even had Calop adduced such evidence, moreover, it has not demonstrated that its suit seeks to restrain or prevent any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state. It has not adduced any evidence that it entered into a services contract with COLA that COLA knew did not provide sufficient funds for Calop to comply with all relevant laws. Accordingly, Calop has not shown that it has a claim for taxpayer standing under § 526a.[69] Because Calop does not, and cannot, argue that it is an aggrieved employee for purposes of Labor Code § 2810, and because it lacks standing

---

**69.** Even had Calop shown that it has taxpayer standing under § 526a, the court doubts it would have Article III standing. Calop contends that it does not have to demonstrate Article III standing if it has standing under § 526a, and that the requirements of Article III are "irrelevant." (Opposition at 21.) Plaintiffs in federal court must show that they have Article III standing even when they raise state law claims as taxpayers under § 526a. *Cantrell v. City of Long Beach,* 241 F.3d 674, 683 (9th Cir.2001) ("California's lenient taxpayer standing requirements do not relieve the [plaintiffs] of the obligation to establish a direct injury under the more stringent federal requirements for state and municipal taxpayer standing"). "To establish standing in a state or municipal taxpayer suit under Article III, a plaintiff must allege a direct injury caused by the expenditure of tax dollars; the pleadings of a valid taxpayer suit must set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity." *Id.* Here, Calop does not even allege it is a taxpayer. Nor has it shown that the government used tax dollars to enforce the LWO. *Id.* ("When a plaintiff has failed to allege that the government spent specific amounts of tax dollars on the challenged conduct, we have denied standing").

under Code of Civil Procedure § 526a, Calop has not shown that it has standing to assert a claim under § 2810. The court thus grants summary judgment in COLA's favor on this aspect of Calop's fifth claim for relief.

Calop next asserts claims under Labor Code §§ 90.5(a) and 223. Neither section provides a private right of action. Section 90.5(a) recites that it is the public policy of the state

> "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards." CAL. LAB. CODE § 90.5(a).

To achieve this goal, the state has delegated the power to enforce various provisions of the Labor Code to the State Labor Commissioner. *Id.,* § 90.5(b); see also *Painting & Drywall Work Preservation Fund, Inc. v. Aubry,* 206 Cal.App.3d 682, 687, 253 Cal.Rptr. 776 (1988) ("While the subdivision (a) of [Labor Code § 90.5] generally states the legislative intent to vigorously enforce minimum labor standards, subdivision (c) clearly grants the Labor Commissioner the right to adopt an enforcement plan and to identify priorities for investigations. Consequently, the Labor Commissioner has discretion to determine which investigations to conduct. The statute creates no duty, express or implied, which requires Division to investigate or take action on every complaint which is filed with the Division").

■■■■ Section 90.5 does not create a private right of action. "A violation of a state statute does not necessarily give rise to a private cause of action." *Lu v. Hawaiian Gardens Casino, Inc.,* 50 Cal.4th 592, 596, 113 Cal.Rptr.3d 498, 236 P.3d 346 (2010).

> "Adoption of a regulatory statute does not automatically create a private right to sue for damages resulting from violations of the statute. Such a private right of action exists only if the language of the statute or its legislative history clearly indicate the Legislature *intended* to create such a right.... If the Legislature intends to create a private cause of action, we generally assume it will do so 'directly[,] ... in clear, understandable, unmistakable terms.'" *Vikco Ins. Services, Inc. v. Ohio Indem. Co.,* 70 Cal.App.4th 55, 62–63, 82 Cal.Rptr.2d 442 (1999) (citing *Moradi–Shalal v. Fireman's Fund Ins. Companies,* 46 Cal.3d 287, 294–95, 250 Cal.Rptr. 116, 758 P.2d 58 (1988)) (alterations original).

Where the language used by the statute or the statutory scheme clearly indicates that no private right of action exists, the court need not to look to the legislative history. *Violante v. Communities Southwest Development and Const. Co.,* 138 Cal.App.4th 972, 979, 41 Cal.Rptr.3d 673 (2006) ("As set forth in the Labor Code [ ], the labor commissioner determines whether there has been any violation of the prevailing wage law and then issues wage and penalty assessments. (§§ 1741, 1775(a).) ... But again, it is the labor commissioner, not an employee, who pursues such claims. No ambiguity in the foregoing language or statutory scheme causes us to need elucidation from the legislative history").

By its express terms, § 90.5 does not create a private right of action. The statute sets forth the public policy of the state. Sections 90.5(b-d) delegate power to the Labor Commissioner to ensure that that public policy is carried out by enforcing other provisions of the Labor Code. Noth-

ing in § 90.5 expressly states that individuals may assert a claim for violation of the public policy. See *Lu,* 50 Cal.4th at 598, 113 Cal.Rptr.3d 498, 236 P.3d 346 (concluding that California Labor Code § 351, which provides that employers shall not collect gratuities given to their employees, and that "[e]very gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for," did not expressly create a cause of action because it did not "unmistakably reveal a legislative intent to provide wronged employees a private right to sue").

Moreover, the statutory scheme also clearly indicates that no private cause of action exists under § 90.5(a). In *Lusardi Construction Co. v. Aubry,* 1 Cal.4th 976, 985–86, 4 Cal.Rptr.2d 837, 824 P.2d 643 (1992), the California Supreme Court stated that § 90.5(a) set forth the public policy of California with respect to minimum wages. The Court then stated that "[t]he conditions of employment on [public works] projects financed in whole or in part by public funds are governed by the prevailing wage law," citing Labor Code §§ 1720–1861. *Id.* at 985, 4 Cal.Rptr.2d 837, 824 P.2d 643. As the plain language of § 90.5 indicates, and as the Supreme Court recognized in *Lusardi,* California's prevailing wage law is comprised both of the introductory policy statement set forth in § 90.5(a) and later provisions that set forth the obligations with which employers must comply. Section 90.5(a) identifies no specific employer duties, and provides no guidance that would permit an employer to know if or how it had violated California law. The provision merely provides an overview of the purpose of the prevailing wage law. Because the text of the statute does not unmistakably provide a private cause of action and because the statutory scheme clearly shows that § 90.5(a) is a statement of policy rather than a statute that creates enforceable rights and duties, the court concludes that § 90.5(a) does not create a private cause of action.

As respects Labor Code § 223, moreover, that provision states only that "[w]here any statute or contract requires an employer to maintain [a] designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." *Id.,* § 223. This statute also does not create a private cause of action. See *Johnson v. Hewlett–Packard Co.,* 809 F.Supp.2d 1114, 1136 (N.D.Cal.2011) ("[S]ection 223 does not create a private right of action ... because it does not set forth an entitlement to a wage or provide a penalty"). Rather, anyone who violates the statute is guilty of a misdemeanor and may be assessed civil penalties collected by the California Labor Commissioner. See *id.,* §§ 225, 225.5.

Aggrieved employees, however, may bring a civil action "on behalf of" themselves and other current or former employees to enforce sections of the Labor Code that provide for a civil penalty under the Private Attorney General Act of 2004 ("PAGA"). *Id.,* §§ 2698 et seq; *Johnson,* 809 F.Supp.2d at 1137 ("PAGA provide[s] a private right of action when a Labor Code section provides for a penalty"). Labor Code § 225 provides a civil penalty for the violation of § 223. Thus, an aggrieved employee could sue under PAGA to collect the penalty. An aggrieved employee, however, "means any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." *Id.,* § 2699. As noted, Calop has not alleged that it is an aggrieved employee, nor has it adduced evi-

dence showing that it is.[70] For reasons already articulated, moreover, Calop has not shown that it has taxpayer standing under § 526a to assert claims under either Labor Code §§ 90.5(a) or 223. Calop thus lacks standing to sue under these sections.

■■■ More fundamentally, the provisions of the Labor Code on which Calop bases its fifth cause of action are designed to protect employees from unscrupulous employers who do not pay required wages. Calop is the employer of the workers whose salary is at issue in this case. COLA does not employ these individuals and Calop has not shown that COLA entered into any contract with Calop. Calop's assertion that COLA violated these provisions by enacting and enforcing the LWO although it knew of Calop's contract with the SEIU[71] is therefore misguided. COLA enforced the LWO only for a period prior to the inception of the SEIU contract. Far from having shown that there are triable issues of fact with respect to its fifth cause of action, Calop fails even to demonstrate that it has stated a cognizable claim for relief. See *Rojas*, 567 F.Supp.2d at 1211 (dismissing a § 2810 claim and stating that "section 2810(a) places on plaintiffs the burden [of] showing that defendants entered into contracts knowing them to be insufficient"). The court therefore grants summary judgment in COLA's favor on Calop's fifth cause of action.

### H. Whether the Court Should Grant Plaintiff's Motion for Sanctions

#### 1. Legals Standard Governing Sanctions Under 28 U.S.C. § 1927

Calop contends the court should sanction COLA attorneys Oscar R. Winslow, Jeffrey Z.B. Springer, and Jennifer T. Taggart for denying various allegations in Calop's complaint and requests for admission.[72] Section 1927 provides:

"Any attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

■■■ The purpose of § 1927 sanctions is to deter "unnecessary filings and

---

**70.** Calop, moreover, cannot bring a claim on behalf of its employees under PAGA. "The [PAGA] does not create property rights or any other substantive rights. Nor does it impose any legal obligations. It is simply a procedural statute allowing an aggrieved employee to recover civil penalties—for Labor Code violations—that otherwise would be sought by state labor law enforcement agencies.... [T]he right to recover a statutory penalty may not be assigned.... Therefore, under the [PAGA] an aggrieved employee cannot assign a claim for statutory penalties because the employee does not own an assignable interest." *Villacres v. ABM Industries Inc.*, 189 Cal.App.4th 562, 579, 117 Cal.Rptr.3d 398 (2010).

**71.** Opposition at 22–23.

**72.** Sanctions Motion at 4. Calop requests that the court take judicial notice of several documents in connection with its sanctions motion: (1) City of Los Angeles Ordinance Number 18077; (2) a document entitled "Living Wage Ordinance (LWO)"—Frequently Asked Questions January 2010, taken from the City's website for the LWO; and (3) an October 21, 2010 letter from Sophy Tzeng to Connie Chong. (Plaintiff's Request for Judicial Notice in Support of Motion for Sanctions, Docket No. 28–2 (July 25, 2013), at 2–4.) COLA does not object to Calop's request. For reasons already discussed, it is appropriate for the court to take judicial notice of the Ordinance and Frequently Asked Questions. It is not necessary for the court to take judicial notice of the letter from Sophy Tzeng to Connie Chong because it is part of the evidence in this case. The court therefore declines to take judicial notice of the document.

tactics once a lawsuit has begun." *In re Keegan Mgmt. Co., Securities Litigation,* 78 F.3d 431, 435 (9th Cir.1996). "[D]amages under section 1927 are appropriate where there is no obvious violation of the technical rules, but where, within the rules, the proceeding is conducted in bad faith for the purpose of delay or increasing costs." *Matter of Yagman,* 796 F.2d 1165, 1187 (9th Cir.1986). Before § 1927 sanctions can be imposed, the court must make a finding that the attorney's conduct was at least reckless. *Lahiri v. Universal Music and Video Distribution Corp.,* 606 F.3d 1216, 1218–19 (9th Cir.2010) ("Recklessness suffices for § 1927 sanctions, but sanctions imposed under the district court's inherent authority require a bad faith finding"); see also *Braunstein v. Arizona Dept. of Transp.,* 683 F.3d 1177, 1189 (9th Cir.2012) (citing *Lahiri,* 606 F.3d at 1219); *Fink v. Gomez,* 239 F.3d 989, 993 (9th Cir.2001) ("[R]ecklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power"). But see *Salstrom v. Citicorp Credit Services, Inc.,* 74 F.3d 183, 184 (9th Cir.1996) ("[A] finding [of bad faith] is required both for the imposition of monetary sanctions under § 1927, and for the imposition of nonmonetary sanctions under the court's inherent power" (internal citations omitted)).[73] "For sanctions to apply [under § 1927], if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass." *In re Keegan,* 78 F.3d at 436.

 The decision to sanction a party rests , in the sound discretion of the district court. See, e.g., *Trulis v. Barton,* 107 F.3d 685, 694 (9th Cir.1997) (district court abused its discretion by not awarding § 1927 sanctions); *MGIC Indemnity Corp. v. Moore,* 952 F.2d 1120, 1121 (9th Cir.1991) (holding that the district court abused its discretion by awarding § 1927 sanctions). As with sanctions awarded pursuant to the court's inherent powers, § 1927 sanctions must be tailored to the particular conduct challenged. See, e.g., *Blodgett,* 709 F.2d at 610–11 ("Section 1927 only authorizes the taxing of excess costs arising from an attorney's unreasonable and vexatious conduct; it does not authorize imposition of sanctions in excess of costs reasonably incurred because of such conduct"); *Doyle v. Illinois Central Railroad Co.,* No. CV F 08–0971 LJO SM, 2009 WL 224897, *6 (E.D.Cal. Jan. 29, 2009) (quoting *Blodgett* ).

## 2. Whether the Court Should Impose Sanctions on COLA

Calop complains that COLA's attorneys frivolously denied paragraphs 7–8, 11–15,

---

**73.** In *B.K.B. v. Maui Police Dep't,* 276 F.3d 1091 (9th Cir.2002), the Ninth Circuit noted that "[its] cases have been less than a model of clarity regarding whether a finding of mere recklessness alone may suffice to impose sanctions for attorneys' fees. For example, in *United States v. Blodgett,* 709 F.2d 608, 610 (9th Cir.1983), [it] held that § 1927 sanctions require a finding of recklessness *or* bad faith. See also *Barber v. Miller,* 146 F.3d 707, 711 (9th Cir.1998) ('An award of sanctions under 28 U.S.C. § 1927 or the district court's inherent authority requires a finding of recklessness or bad faith'). However, [it has] also held that 'section 1927 sanctions must be supported by a finding of subjective bad faith,' which 'is present when an attorney knowingly or recklessly raises a *frivolous* argument, or argues a meritorious claim for the purpose of harassing 'an opponent.' *In re Keegan Mgmt. Co.* [ ] . . . [The court's] most recent pronouncement on the proper legal standard for § 1927 sanctions comes from the case of *Fink v. Gomez* . . . . In *Fink,* [the court] reconciled *Blodgett, Keegan,* and *Barber* by holding that 'recklessness suffices for § 1927, but bad faith is required for sanctions under the court's inherent power.' " *B.K.B.,* 276 F.3d at 1107 (some citations omitted). Subsequent Ninth Circuit cases have also held that a finding of recklessness may suffice under § 1927. See *Braunstein,* 683 F.3d at 1189; *Lahiri,* 606 F.3d at 1218–19.

17–19, and 36 of its complaint, as well as Requests Nos. 130–131, 134–135, 139, 141, 143–144, and 147–149 of its second set of requests for admission. COLA first argues that it cannot be sanctioned under § 1927 for anything included in its answer.[74] Citing *In re Keegan,* 78 F.3d 431, COLA contends that answers do not multiply proceedings and are therefore not the proper subject of § 1927 sanctions.[75] The court is not confident that *In re Keegan* stands for the proposition that an attorney cannot be sanctioned under § 1927 for recklessly submitting a frivolous answer to a complaint. In that case, the Ninth Circuit held that "[b]ecause [ ] section [1927] authorizes sanctions only for the 'multipli[cation of] proceedings,' it applies only to unnecessary filings and tactics once a lawsuit has begun. We have twice expressly held that § 1927 cannot be applied to an initial pleading." *Id.* at 435 (citing *Zaldivar v. City of Los Angeles,* 780 F.2d 823, 831 (9th Cir.1986) ("[T]he *multiplication* of proceedings is punished, thus placing *initial* pleadings beyond [the] reach" of § 1927 (emphasis in original)); *Yagman,* 796 F.2d at 1187 ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed")).

Each of the cases cited states clearly that § 1927 applies to attorneys' conduct after a lawsuit has commenced. Although an answer may be a required "initial pleading," unlike a complaint, it is filed after the lawsuit has commenced. The manner in which an attorney chooses to answer a complaint, moreover, can certain-ly have the effect of multiplying proceedings. If, for example, an attorney chooses to deny a factual allegation without a reasonable basis for denial, the plaintiff will be forced to engage in discovery to prove the allegation. That discovery will multiply proceedings. COLA has not cited, and the court has not found, a case in which a court found that an answer constituted an initial pleading that was exempt from § 1927 sanctions.

▓▓ Nonetheless, Calop has not shown that COLA's denial of the cited paragraphs in the complaint multiplied proceedings. COLA contends the paragraphs it denied were either incorrect statements of the law or ambiguous. A review reveals that each is a paraphrase of the text of the LWO.[76] Several appear to be incomplete statements of the law because they do not distinguish between airport employees and other employees.[77] Several others, however, are correct quotations of the law.[78] COLA nonetheless denied each, stating that it "lack[ed] sufficient knowledge or information ... to form a basis as to the truth of th[e] factual allegations asserted [ ]in" the paragraph.[79] While the court does not condone the denial of allegations that appear to be correct statements of the law, it concludes that sanctions under § 1927 are not appropriate since the denial of allegations concerning the state of the law does not multiply proceedings. Calop was not required to engage in discovery because COLA refused to admit the terms of the LWO. Those terms are not subject to reasonable dispute. Calop did not need to have COLA confirm the content of the ordinance in order to proceed with its

---

74. Sanctions Opp. at 5.

75. *Id.*

76. See Complaint, ¶¶ 7–8, 11–15, 17–19.

77. See e.g., *id.,* ¶¶ 13–14.

78. Compare, e.g., *id.,* ¶¶ 7–8 with L.A. Admin. Code §§ 10.37.2(a), 10.37.3(a).

79. See Answer, Docket No. 10 (Nov. 20, 2012), ¶¶ 5–6, 9–13, 15–17.

claims. For that reason, although COLA may have acted recklessly given that it later included similar paraphrases of the LWO in its statement of undisputed facts, there is no evidence that its conduct multiplied proceedings. It was Calop that sent repeated requests for admission to COLA seeking to have it admit that its denials of various paragraphs of the complaint were false. If any party's conduct generated additional, unnecessary attorney's fees, therefore, it was Calop's.

■■■■■■■ The court similarly declines to impose sanctions on COLA based on its objections to and denials of Calop's requests for admission. In addition to the reasons already stated, Calop has not shown that COLA's objections and denials were frivolous. With the exception of Request No. 134, each of Calop's requests either paraphrases, quotes, or seeks to have COLA admit generalized statements about the effect of the LWO.[80] Under Rule 36 of the Federal Rules of Civil Procedure, "[a] party may serve on any other party a written request to admit ... the truth of ... facts, the application of law to fact, or opinions about either." FED. R. CIV. PROC. 36(a)(1). "Requests for admissions[, however,] cannot be used to compel an admission of a conclusion of law." *Playboy Enterprises, Inc. v. Welles,* 60 F.Supp.2d 1050, 1057 (S.D.Cal.1999). See also *Martin v. Safeco Ins. Co. of America,* No. 2:11–cv–01063 MCE KJN, 2012 WL 3070680, *1 (E.D.Cal. July 27, 2012)

("[P]laintiffs' requests for admission numbered 14 through 24 ask defendant to admit or deny what its general 'legal obligations' were in the context of reviewing and settling plaintiff Kristel Martin's insurance claim or claims, which amount to improper requests for admissions or denials as to legal conclusions"); *Google Inc. v. American Blind & Wallpaper Factory, Inc.,* No. C 03–5340 JF (RS), 2006 WL 3290402, *2 (N.D.Cal. Nov. 13, 2006) ("Google seeks to compel American Blind to respond (other than with objections) to two requests for admissions. The first request seeks an admission that under certain described circumstances no 'use' of American Blind's trademarks would occur 'within the meaning of the Lanham Act.' Under Fed. R. Civ. [P.] 36, requests for admission may properly relate to 'the application of law to fact,' but 'requests for admissions cannot be used to compel an admission of a conclusion of law.' *Playboy Enterprises, Inc. v. Welles,* 60 F.Supp.2d 1050, 1057 (S.D.Cal.1999)").

Calop's requests for admission were thus improper under Rule 36, and COLA had a legitimate basis upon which to object to the requests. COLA objected to each request, stating "[d]efendant further objects to this request to the extent that it impermissibly seeks to compel an admission of a conclusion of law. Requests for admission cannot be used to compel an admission of a conclusion of law."[81]

---

**80.** See Declaration of Juan Hong in Support of Motion for Sanctions ("Hong Sanctions Decl."), Docket No. 28 (July 25, 2013), Exh. 5 (Plaintiff's Request for Admission to City of Los Angeles, Set Two). At the hearing, Calop argued that its requests for admission were requests for the admission of facts, not law, because they were drawn from the LWO— Frequently Asked Questions portion of the LWO website, which purportedly provides factual information concerning the LWO. It asserts, therefore, that the requests were proper. The requests for admission were each paraphrases, quotations, or generalized descriptions of the effect of the LWO, which is an ordinance. Consequently, Calop sought to have COLA admit principles of law or the legal effect of the ordinance, which were not proper requests for admission.

**81.** Hong Sanctions Decl., Exh. 6 (Defendant's Response to Plaintiff's Requests for Admission at 2–20).

COLA cited *Playboy Enterprises*.[82] COLA also objected to each request for admission on the basis that it "contain[ed] an incomplete summary and/or inaccurate quote."[83] Because COLA's objections to and denial of the requests had a basis in law, its conduct was neither reckless nor frivolous. See *Pratt v. California*, 11 Fed. Appx. 833, 835 (Unpub. Disp.) (9th Cir. 2001) ("A filing is frivolous if it 'is *both* baseless *and* made without a reasonable and competent inquiry,'" citing *In re: Keegan*, 78 F.3d at 436). Calop, for its part, propounded further requests for admission seeking to have COLA admit that its prior denials had been false.[84] COLA's refusal to admit that its objections and denials had been "false" when it had a legal basis for objecting did not unreasonably or vexatiously multiply proceedings. For the reasons discussed above, moreover, because the requests for admission concerned legal conclusions, COLA's denial of them did not multiply proceedings; it was not necessary for Calop to engage in discovery to establish the law that applied to the case.

As respects Request No. 134, Calop asked that COLA "[a]dmit that the following statements are true: Due to the financial impact of the Living Wage increase to the existing concessions, Los Angeles World Airport ("LAWA") will allow the concessions to increase prices to cover the increase in labor costs or consider reducing rent charged to the concessions to help off-set the costs. Price increases by LAWA concessionaires are governed by the concession agreements."[85] COLA ob-

jected to this request for the same reason it objected to those that paraphrased the language of the ordinance, and denied the request.[86] The statement regarding actions LAWA intended to take with respect to concessions vendors is not a question of law, but rather a question of fact. Calop's request was therefore proper. Nonetheless, Calop has not shown that COLA acted recklessly when it objected to and denied this request. Unlike many of the statements of law that COLA denied, but later included in its statement of undisputed facts, COLA did not include this statement in its undisputed facts, and Calop has made no showing that COLA knew it had no legal or factual basis to deny the request. Absent proof of recklessness, the court cannot award § 1927 sanctions. See *Certain Underwriters at Lloyd's London v. Rauw*, No. C 05–2377 SBA, 2007 WL 2729117, *7 (N.D.Cal. Sept. 18, 2007) ("Without proof of recklessness or bad faith, Rauw's claim under 28 U.S.C. [§ ] 1927 is meritless").

 Even were there proof of recklessness, however, the court would exercise its discretion in favor of declining to sanction COLA for objecting to and denying this single request for admission. "The use of the word 'may'—rather than 'shall' or 'must'—confers substantial leeway on the district court when imposing sanctions. Thus, with § 1927 as with other sanctions provisions, '[d]istrict courts enjoy much discretion in determining whether and how much sanctions are appropriate.'" *Haynes v. City and County of San Francisco*, 688 F.3d 984, 987 (9th

**82.** *Id.*

**83.** *Id.*

**84.** Declaration of Jeffrey Z.B. Springer in Support of Defendant's Opposition to Motion for Sanctions, Docket No. 35 (Sept. 30, 2013), ¶ 4.

**85.** Hong Sanctions Decl., Exh. 5 (Plaintiff's Request for Admission to City of Los Angeles at 5).

**86.** *Id.*, Exh. 6 (Defendant's Response to Plaintiff's Requests for Admission at 6).

Cir.2012) (citing *Trulis v. Barton,* 107 F.3d 685, 694 (9th Cir.1995)). The court does not believe that COLA's objection to and denial of this one request merits § 1927 sanctions, and it therefore denies Calop's motion for sanctions.

### III. CONCLUSION

For the reasons stated, the court grants COLA's motion for summary judgment on each of Calop's five claims for relief. It denies Calop's motion for sanctions.